## SYMNS GROCERY COMPANY V. SNOW BROTHERS.

FILED MAY 3, 1899.   No. 8894.

1. **Attachment: MOTION TO DISSOLVE: RIGHTS OF DEFENDANT.** A defendant in an attachment proceeding may move to discharge the attachment although he may have disposed of his entire interest in the property, or, for other reasons, at the time may have no further interest therein.

2. **Order Dissolving Attachment: REVIEW.** The finding and order of the district court determined against the clear and decisive preponderance of the evidence; hence reversed.

ERROR from the district court of Phelps county. Tried below before BEALL, J. *Reversed.*

*G. Norberg* and *Hall, St. Clair & Roberts,* for plaintiff in error.

*Rhea Bros. & Manatt* and *S. A. Dravo, contra.*

HARRISON, C. J.

E. H. Snow and W. S. Snow, brothers, who were in partnership and in the general mercantile business in Holdrege on June 15, 1895, executed three chattel mortgages, each of which purported to incumber the entire stock of merchandise then in the firm's business room or rooms at the place we have indicated. One of the mortgages was in favor of the plaintiff in this action and the amount stated in it was $1,479.41. One was to the United States National Bank of Holdrege, the sum named in it being $2,400. Another was made to S. A. Parker, an uncle of the brothers, and the expressed consideration was $2,774.75. The firm also on the same day conveyed a piece of city property to one J. J. Parker, who immediately transferred it to Bertina Snow, the wife of W. S. Snow, one of the members of the firm. The real estate thus conveyed was the only property of that nature the title to which then rested in the partnership, or rather

was of record in its name.   The mortgages were executed
in the office of a firm of attorneys in the city about 4
o'clock P. M. of the day and were left with the attorneys
to be filed.   The plaintiff company and the bank neither
had any knowledge of the execution of the mortgage to
it, and when such knowledge was received did not accept
the action apparently performed for its benefit and in
its behalf.   Each instituted a suit, in which a writ of at-
tachment was procured to issue and was levied on the
stock of merchandise by the officer to whom it was di-
rected and delivered.   At the time of the execution of
the mortgages the firm of Snow Bros. was indebted to
the plaintiff in the sum of $1,510.29; to the bank, $2,400;
the claim of the uncle, S. A. Parker, was $2,774.75; in-
debtedness to other creditors, about $1,000; total debts,
about $7,685.04.   The value of the stock of merchandise
was $4,900.   For S. A. Parker there was commenced an
action of replevin, and under the writ therein issued pos-
session of the stock of goods was taken and delivered to
him.   There was a trial of the replevin action, but prior
to that trial or a hearing of the attachment portion of
the case at bar Parker had foreclosed the chattel mort-
gage on the stock, offered the whole of the merchandise
for sale, and as a whole, and at the sale bid in the stock
for about $2,600.   He made sufficient sales from it after-
wards to realize therefrom about $1,100, and then turned
it over to Hattie A. Snow, the wife of E. H. Snow.   In
consideration of the transfer to her she gave S. A. Parker
her notes aggregating $4,900.   She, subsequent to the
deal by which she gained possession of the goods, pur-
chased the claim of the United States National Bank
against Snow Bros. in the amount of $2,400, for which
she paid $1,800.   For this latter amount she gave her note
to the bank.

The ground for attachment in this action was stated
in the affidavit as follows:   "That the defendants have
sold, conveyed, and otherwise disposed of their property
with intent to cheat and defraud their creditors and to

hinder and delay them in the collection of their debts, and that defendants are about to sell and convey and dispose of their property with fraudulent intent." There was filed in the action what was styled an "Answer and Motion," which was verified positively and was also made to perform the office of an affidavit in denial of the assertions in the affidavit for attachment. It was objected to as not being sufficient, either as an affidavit or a motion. There was also an objection that the plaintiff had not been notified of any hearing of a motion to dissolve the attachment. These matters we shall pass over and examine into what was developed at the hearing of what at least was treated as a motion to dissolve the attachment.

As a result of the hearing the attachment was dissolved. The plaintiff complains that the defendants should not have been allowed to attack the attachment, since prior to the time of the attack they had transferred the property and had no longer its ownership or possession. This contention cannot prevail. The defendants could be heard to move the discharge of the attachment on the ground of the falsity of the affidavit upon which it was predicated. (*McCord v. Bowen*, 51 Neb. 247; *Grimes v. Farrington*, 19 Neb. 44; *Kilpatrick-Koch Dry Goods Co. v. Bremers*, 44 Neb. 863; *Dayton Spice-Mills Co. v. Sloan*, 49 Neb. 622; *Kountze v. Scott*, 52 Neb. 460; *South Park Improvement Co. v. Baker*, 51 Neb. 392.)

It is urged that upon the evidence adduced the trial court should have sustained the attachment; that its decision is clearly wrong and not supported by the evidence. S. A. Parker, the uncle of the two brothers, the members of the firm, was called as a witness, and after stating certain facts in regard to the indebtedness of the firm to him, how it was incurred, etc., further testified of the execution and delivery of the chattel mortgage on the stock of goods by the firm to him, the subsequent foreclosure of the mortgage, inclusive of the sale of the goods and his bid therefor, also of an attempt to sell the stock to an Iowa man, and further as follows:

"Q. What effort did you make to dispose of the goods while you were selling them, if any?

A. After I got the goods the First National Bank,—one of the members, the president or cashier,—had a conversation with me in regard to having the goods purchased—

Q. The First National or United States National?

A. The United States National—to let Eugene H. Snow and wife take the goods and sell them out. They said that he could manage the goods and get a large amount out of them. I told them I was willing to do that, provided they would advance me a thousand dollars on my claim and I would let the rest stand and take the rest out of the goods. They said, "No, you ought to prorate with us, and if you will do that we will let Mr. and Mrs. Eugene H. Snow have the goods and sell them out." They urged me to do that with them and the Symns Grocery Company, the three together, and, by the way, Mr. Norburg had some talk with me about it. I told them I could not do that, but I would take part of mine and let the rest come out as they could. This same Iowa man, I kept him here about a week to try to sell to him, but he went away without purchasing, and decided that he would not give what I wanted to make on the goods. During this time Eugene Snow and W. S. Snow says, "We don't want you to sell these goods to the Iowa man unless he will give more than enough to pay your claim." I said, "I could not get enough to pay me," but they says, "We must have more than that out of it. We don't want the United States Bank to lose." I made up my mind I would not sell it unless I could get something out of it besides my claim. I proposed to take the goods and sell them out to pay me first and the Symns Grocery Company. I talked to the bank, and they said, "If you do anything, let Eugene Snow and his wife take it;" so I decided to drop the other matter. Then I tried to get Mr. Snow to propose it to her, and he finally did. I went up and talked with her in regard to it, and they went down and talked with the bank in regard to this matter. I

tried to get a compromise that whatever amount they should pay me should go to the United States Bank and Symns Grocery Company, and we tried to figure out how much of a percentage they could figure on the debts. The Symns Grocery Company would not accept. I think at that time they were going to pay them about twenty-three hundred dollars on their claim, but they finally refused. Mr. W. S. Snow said, "I have a friend that I think will buy the goods and put me in charge of them." I says, "See what you can do." He came back and says, "We can pay you so much money and give you security for the rest of your claim, and we will sell the goods and every dollar shall be turned in to pay first the United States Bank and then the Grocery Company." I said, "What security have I that that will go to pay them?" Each party said, "Don't let the goods go without getting something out of them to pay our debts." So I said, "I wouldn't do it without I could get a guaranty that it would go to pay the debts." The other party wouldn't consent to that; I presume Mr. Snow would. Then I had to go back to Mrs. Snow, and she finally consented in this way: that she would pay me so much for the goods,— with a great deal of reluctance it was too, I assure you;— she would pay me so much for the goods, and first pay my claim, and the balance I should have in a note to hold her that the balance should apply on the balance of the debts. I took it in separate notes that way, so the balance stands the note I held of hers. When certain conditions are complied with regarding those debts, that note is to be returned to her without a cent's payment to me. She consented to it and I turned the goods over to her. During that time I had sold goods up to something in the neighborhood of eleven hundred dollars. I had also taken a bill of goods of my own, which, with the other item I had taken previously, amounted to something like eighty dollars. When I went away Mrs. Snow borrowed eighty dollars of my brother and gave to me, which he wrote since she has paid, leaving one note I took of thir-

teen hundred dollars. I took the note for the balance which then was supposed to be due. I will say that a few bills of expenses I had not got hold of which they were to pay and afterwards settled; for instance, I had not got the printing bill, but they paid afterwards and sent me. The balance coming to me was about seventeen hundred and forty dollars. The rest of the amount was a little less than nineteen hundred dollars, which was the amount that I would conditionally surrender, but I had got to know that the amount would be applied on her debts.

Q. You mean the boys' debts?

A. On the debts of Snow Bros., and it was the request of W. S. Snow that I should request that be done to relieve him.

Q. Those are the notes that have been introduced?

A. I never want a dollar of that amount, but it should be explained to my satisfaction in paying those debts and I am to surrender those notes, there is about a thousand dollars due me on my personal debt.

It also appeared of evidence that two brothers of the Mrs. Snow, who finally held possession of the stock of goods, had, prior to the time of the transactions which are most prominent in this action, loaned to the United States National Bank $10,000, and were quite anxious that the bank should not lose its claim or any part thereof which it had against the firm of Snow Bros., and that they were somewhat active in urging the arrangement of the affair of the transfer of the possession of the stock of goods to Mrs. Snow, because thereby the bank would be materially assisted in the collection of its debt against the firm and be more able to meet its own liabilities.

The course pursued by S. A. Parker, in that after he had obtained a chattel mortgage on the goods, had foreclosed it and at the sale bid in the stock, had been in its possession and selling it at retail, and at the solicitation of the individual members of the firm delivered possession and control to the wife of one of them to be disposed

of to benefit the uncle and the firm, not the wife, is scarcely consistent with true dealing, nor is it the usual manner of conducting a *bona fide* transaction of transfer.

The portion of the evidence which we have quoted, in connection with other facts and circumstances disclosed, lead to a conclusion that supports the affidavit in attachment. The finding and order of the trial court were clearly wrong. The preponderance of evidence against the ruling was strong and decisive. The order is reversed and the district court is directed to reinstate the attachment.

JUDGMENT ACCORDINGLY.